Gregory F. Corbett (admitted *pro hac vice*)
gcorbett@wolfgreenfield.com
WOLF, GREENFIELD & SACKS, P.C.
600 Atlantic Avenue
Boston, MA 02210
Telephone: 617.646.8000

Asim M. Bhansali (SBN 194925)
abhansali@kblfirm.com
KWUN BHANSALI LAZARUS LLP
555 Montgomery Street, Suite 750
San Francisco, CA 94111
Telephone: 415.630.2350

*Counsel for Defendant Google LLC*
*[Additional Counsel Listed Below]*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

METARAIL, INC.,

Plaintiff,

v.

GOOGLE LLC,

Defendant.

Case No: 5:25-cv-09568-BLF

**DEFENDANT GOOGLE LLC'S NOTICE OF MOTION AND MOTION TO DISMISS AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**

Date: March 18, 2027
Time: 9:00 a.m.
Judge: Beth Labson Freeman

Date Filed: October 15, 2026
Trial Date: TBD

**TABLE OF CONTENTS**

I. INTRODUCTION .......... 1
II. BACKGROUND .......... 3
III. LEGAL STANDARDS .......... 5
IV. ARGUMENT .......... 6
A. Claim 1 of the '626 Patent Is Ineligible Under § 101 .......... 6
1. *Alice* Step One: Claim 1 Is Directed to An Abstract Idea .......... 6
a. Claim 1 Focuses on Translation to Automate Ad Generation .......... 7
i. *Manually Created Deep-Linked Ads Were Already Known* .......... 7
ii. *Automating Existing Human Processes Is Abstract* .......... 8
iii. *The "Universal Variable Map" Concerns Indexing and Translation—Not a Technical Improvement* .......... 10
b. The Remaining Claim Elements Concern Collecting and Analyzing Data—Not Any Technological Improvement .......... 12
2. *Alice* Step Two: Claim 1 Recites No Inventive Concept .......... 14
a. Increased Speed and Efficiency is Immaterial .......... 14
b. Claim 1 Differs Fundamentally From Those in *DDR* .......... 15
B. The Additional Elements of the Other Identified Claims Do Not Render Them Eligible Under § 101 .......... 17
1. Claim 1 of the '378 Patent Is Ineligible Under § 101 .......... 17
a. *Alice* Step One: Claim 1 is Directed to an Abstract Idea Despite the Additional Elements .......... 18
i. *"obtaining" "field identifiers" using "rules"* .......... 18
ii. *"normalized variable data database"* .......... 20
iii. *"pre-existing relationship"* .......... 20
b. *Alice* Step Two: Claim 1 Recites No Inventive Concept .......... 21
2. Claim 1 of the '342 Patent Is Ineligible Under § 101 .......... 23
3. Claim 1 of the '734 Patent Is Ineligible Under § 101 .......... 24
C. The FAC Fails to State Plausible Allegations as to the Remaining Claims .......... 25
V. CONCLUSION .......... 25

# TABLE OF AUTHORITIES

**Cases**

*Aatrix Software, Inc. v. Green Shades Software, Inc.*,
882 F.3d 1121 (Fed. Cir. 2018)........ 5

*Adaptive Streaming Inc. v. Netflix, Inc.*,
836 F. App'x 900 (Fed. Cir. 2020)........ 11

*Affinity Labs of Texas, LLC v. DIRECTV, LLC*,
838 F.3d 1253 (Fed. Cir. 2016)........ 16

*AI Visualize, Inc. v. Nuance Commc'ns, Inc.*,
97 F.4th 1371 (Fed. Cir. 2024)........ 15

*Alice Corp. Pty. v. CLS Bank Int'l*,
573 U.S. 208 (2014)........ passim

*Ariosa Diagnostics, Inc. v. Sequenom, Inc.*,
788 F.3d 1371 (Fed. Cir. 2015)........ 14, 21

*Beteiro, LLC v. DraftKings Inc.*,
104 F.4th 1350 (Fed. Cir. 2024)........ 20

*BSG Tech LLC v. Buyseasons, Inc.*,
899 F.3d 1281 (Fed. Cir. 2018)........ 12

*Cardpool, Inc. v. Plastic Jungle, Inc.*,
817 F.3d 1316 (Fed. Cir. 2016)........ 2

*Cave Consulting Group, Inc. v. Truven Health Analytics Inc.*,
No. 15-cv-02177-SI, 2017 WL 6405621 (N.D. Cal. Dec. 15, 2017), aff'd, 756 F. App'x 997 (Fed. Cir. 2019)........ 19, 20, 22

*Credit Acceptance Corp. v. Westlake Servs.*,
859 F.3d 1044 (Fed. Cir. 2017)........ 8, 21

*DDR Holdings, LLC v. Hotels.com, L.P.*,
773 F.3d 1245 (Fed. Cir. 2014)........ 15, 16, 17, 22

*Digitech Image Techs., LLC v. Elecs. for Imaging, Inc.*,
758 F.3d 1344 (Fed. Cir. 2014)........ 22

*directPacket Rsch., Inc. v. Polycom Inc.*,
No. 19-CV-03918, 2023 WL 6301066 (N.D. Cal. Sept. 26, 2023), *aff'd*, 2025 WL 1752247 (Fed. Cir. June 25, 2025)........ 11

*EcoFactor, Inc. v. Google LLC*,
757 F. Supp. 3d 978 (N.D. Cal. 2024)........ 5

*Elec. Power Grp., LLC v. Alstom S.A.*,
830 F.3d 1350 (Fed. Cir. 2016) .......... 6, 12, 17, 18

*Enfish, LLC v. Microsoft Corp.*,
822 F.3d 1327 (Fed. Cir. 2016) .......... 12

*Enovsys LLC v. Uber Techs., Inc.*,
No. 23-CV-04549-EJD, 2024 WL 3033995 (N.D. Cal. June 17, 2024) .......... 16

*Epic IP LLC v. Backblaze, Inc.*,
351 F. Supp. 3d 733 (D. Del. 2018) .......... 21, 22

*Etison v. Highlevel, Inc.*,
No. 2025-1711, 2026 WL 1906579 (Fed. Cir. July 2, 2026) .......... 15

*FairWarning IP, LLC v. Iatric Sys., Inc.*,
839 F.3d 1089 (Fed. Cir. 2016) .......... 19, 20, 24

*Fitbit Inc. v. AliphCom*,
No. 16-CV-00118-BLF, 2017 WL 819235 (N.D. Cal. Mar. 2, 2017) .......... 23

*Google LLC v. Sonos, Inc.*,
498 F. Supp. 3d 1138 (N.D. Cal. 2020) .......... 16

*Hawk Tech. Sys., LLC v. Castle Retail, LLC*,
60 F.4th 1349 (Fed. Cir. 2023) .......... 11, 18

*Hewlett Packard Enter. Co. v. Inspur Grp. Co.*,
No. 24-CV-02220-JST, 2025 WL 754265 (N.D. Cal. Mar. 10, 2025) .......... 8, 16

*IBM Corp. v. Zillow Grp., Inc.*,
50 F.4th 1371 (Fed. Cir. 2022) .......... passim

*IBM Corp. v. Zillow Grp., Inc.*,
No. 2022-1861, 2024 WL 89642 (Fed. Cir. Jan. 9, 2024) .......... 6, 18

*In re TLI Communications LLC Patent Litigation*,
823 F.3d 607 (Fed. Cir. 2016) .......... 25

*Intell. Ventures I LLC v. Cap. One Bank (USA)*,
792 F.3d 1363 (Fed. Cir. 2015) .......... 25

*Intell. Ventures I LLC v. Cap. One Fin. Corp.*,
850 F.3d 1332 (Fed. Cir. 2017) .......... 11, 12, 16, 24

*Intell. Ventures I LLC v. Erie Indemnity Co.*,
850 F.3d 1315 (Fed. Cir. 2017) .......... 10, 11, 12

*Intell. Ventures I LLC v. Symantec Corp.*,
838 F.3d 1307 (Fed. Cir. 2016) .......... 8, 19, 22

*Interval Licensing LLC v. AOL, Inc.*,
896 F.3d 1335 (Fed. Cir. 2018)........................................................................... 21, 23

*Netflix, Inc. v. Broadcom Inc.*,
No. 24-CV-09324-PCP, 2025 WL 2294915 (N.D. Cal. Aug. 8, 2025)................................ 25

*OIP Inc. v. Amazon.com, Inc.*,
788 F.3d 1359 (Fed. Cir. 2015)........................................................................ 8, 9, 14

*Papst Licensing GmbH & Co. KG v. Xilinx Inc.*,
193 F. Supp. 3d 1069 (N.D. Cal. 2016), *aff'd*, 684 F. App'x 971 (Fed. Cir. 2017) ........................................................................................................ 14

*People.ai, Inc. v. Clari Inc.*,
No. 2022-1364, 2023 WL 2820794 (Fed. Cir. Apr. 7, 2023) ............................................... 12

*PersonalWeb Techs. LLC v. Google LLC*,
8 F.4th 1310 (Fed. Cir. 2021) ...................................................................... 8, 14, 22

*PUREPREDICTIVE, Inc. v. H20.AI, Inc.*,
No. 17-CV-03049-WHO, 2017 WL 3721480 (N.D. Cal. Aug. 29, 2017), *aff'd*, 741 F. App'x 802 (Fed. Cir. 2018) ..................................................................................... 23

*Quad City Pat., LLC v. Zoosk, Inc.*,
498 F. Supp. 3d 1178 (N.D. Cal. 2020) ................................................................... 10

*Receivership Est. of AudienceScience Inc. v. Google LLC*,
No. 2024-1825, 2026 WL 2880090 (Fed. Cir. Sept. 25, 2026) ........................................... 17

*Recentive Analytics, Inc. v. Fox Corp.*,
134 F.4th 1205 (Fed. Cir. 2025) ........................................................................ passim

*RecogniCorp, LLC v. Nintendo Co.*,
855 F.3d 1322 (Fed. Cir. 2017)................................................................................. 14

*RingCentral, Inc. v. Dialpad, Inc.*,
372 F. Supp. 3d 988 (N.D. Cal. 2019) ........................................................................ 19, 21

*Sanderling Mgmt. Ltd. v. Snap Inc.*,
65 F.4th 698 (Fed. Cir. 2023) ............................................................................ 10, 18, 19

*SAP America, Inc. v. INVESTPIC, LLC*,
898 F.3d 1161 (Fed. Cir. 2018)............................................................................ 20, 24

*Secured Mail Solutions LLC v. Universal Wilde, Inc.*,
873 F.3d 905 (Fed. Cir. 2017)................................................................................ 6, 12

*Semiconductor Design Techs., LLC v. Cadence Design Sys., Inc.*,
735 F. Supp. 3d 1162 (N.D. Cal. 2024) ........................................................... 10, 11, 15

*Simio, LLC v. FlexSim Software Prods., Inc.*,
983 F.3d 1353 (Fed. Cir. 2020)........ 8

*SimpleAir, Inc. v. Google LLC*,
884 F.3d 1160 (Fed. Cir. 2018)........ 17

*Software Rts. Archive, LLC v. Facebook, Inc.*,
485 F. Supp. 3d 1096 (N.D. Cal. 2020)........ 11

*SurgeTech, LLC v. Uber Techs. Inc.*,
700 F. Supp. 3d 179 (D. Del. 2023), *aff'd*, 2025 WL 1621648 (Fed. Cir. June 9, 2025)........ passim

*Trading Techs. Int'l, Inc. v. IBG LLC*,
921 F.3d 1378 (Fed. Cir. 2019)........ 10

*Trinity Info Media, LLC v. Covalent, Inc.*,
72 F.4th 1355 (Fed. Cir. 2023)........ 10, 14

*TS Patents LLC v. Yahoo! Inc.*,
279 F. Supp. 3d 968 (N.D. Cal. 2017)........ 25

*Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*,
874 F.3d 1329 (Fed. Cir. 2017)........ 13

*Ultramercial, Inc. v. Hulu, LLC*,
772 F.3d 709 (Fed. Cir. 2014)........ 16

*Univ. of Fla. Rsch. Found., Inc. v. Gen. Elec. Co.*,
916 F.3d 1363 (Fed. Cir. 2019)........ 9

*Universal Secure Registry LLC v. Apple Inc.*,
10 F.4th 1342 (Fed. Cir. 2021)........ 25

*Voip-Pal.Com, Inc. v. Apple Inc.*,
411 F. Supp. 3d 926 (N.D. Cal. 2019), *aff'd*, 828 F. App'x 717 (Fed. Cir. 2020)........ 16

**Statutes**

35 U.S.C. § 101........ passim

**Rules**

Fed. R. Civ. P. 12(b)(6)........ 1, 8

**Regulations**

37 C.F.R. § 1.552........ 2

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on March 18, 2027, at 9:00 a.m., in Courtroom 1, 5th Floor, 280 South 1st Street, San Jose, CA before the Honorable Judge Beth Labson Freeman, Defendant Google LLC ("Google") will and hereby does move pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for an order dismissing Plaintiff Metarail, Inc.'s ("Metarail's") Amended Complaint for Patent Infringement with prejudice.

Google respectfully requests that the Court dismiss the Complaint on the ground that U.S. Patent Nos. 9,633,378 ("the '378 Patent"); 10,152,734 ("the '734 Patent"); 10,262,342 ("the '342 Patent"); and 10,789,626 ("the '626 Patent") (collectively, "Asserted Patents") are directed to ineligible subject matter under 35 U.S.C. § 101. This motion is based upon this Notice; the following Memorandum of Points and Authorities; the complete files and records in this action; the argument of counsel; and such other matters as the Court may consider.

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I. INTRODUCTION

Metarail's First Amended Complaint ("FAC") fails to state a claim upon which relief may be granted because the Asserted Patents—all part of the same family, based on an application drafted before the U.S. Supreme Court's *Alice* decision transformed § 101 law—fail to recite eligible subject matter. The patents concern "deep-linked" advertisements, which employ user-entered search parameters to target ad placement and land users "deep" into the advertiser's web site or application. The Asserted Patents admit that such "parameter-based" deep-linked ads had previously been used in Internet advertising. The ostensible innovation was automating the generation of the deep-linked ads rather than using manual programming. But the Federal Circuit has consistently held that automating known processes does not satisfy § 101. The claimed "universal variable map" underlying the automation (which was known in the art, as the Patent Office recently confirmed) embodies the abstract idea of translating from one set of terms to another—a fundamental practice since the dawn of advertising. For example, one travel website might use "Orig" as the field designating where airline flights originate, whereas another might use "Depart_City." However, none of the claims identified in the FAC offers any

technological detail regarding *how* the universal variable map translates among the terms. Nor do the claims otherwise specify any technological improvement in how computers function. For example, Claim 1 of the '626 Patent recites that the map "link[s] programming variables across multiple sites on the Internet and applications." 22:25-26.[1] But this just restates the abstract idea of translation. The "deep-linked ads" operate the same way—using existing Internet protocols—as earlier deep-linked ads that the patent admits were already in commerce.

Following Google's initial motion to dismiss as to the '626 Patent, Metarail filed the FAC, which merely added a "Background" section (¶¶10-31). The new content parrots the '626 Patent, further confirming that Claim 1 automates a known process while translating between different terms. The FAC does not identify any new technology for such translation. Google accordingly moved to dismiss Metarail's FAC with respect to the '626 Patent. When transferring the case to this Court, the Delaware district court denied Google's motion "without prejudice to re-filing" in this Court "pursuant to [this] Court's local rules." D.I. 42 at 10. Google subsequently renewed its motion with respect to the '626 Patent and also moved to dismiss as to the three other Asserted Patents, which use similar language as Claim 1 of the '626 Patent and suffer from the same fatal flaw under § 101. This Court terminated the previous motion "without prejudice to re-file" in view of the stay of litigation pending ex-parte reexamination. D.I. 72 at 1. Google therefore now renews its motion to dismiss following the reexaminations, which further confirm that the claims are directed to the abstract idea of automation. This Court can and should do what the reexamination examiner could not: find the claims ineligible under § 101. *See Cardpool, Inc. v. Plastic Jungle, Inc.*, 817 F.3d 1316, 1319 (Fed. Cir. 2016) (citing 37 C.F.R. § 1.552 and noting that § 101 eligibility "is not considered on reexamination").

---

[1] Unless indicated, citations are to the '626 Patent (FAC Ex. H) and emphasis is added. The '734 Patent's specification describes additional user interfaces where ads can be displayed, and additional examples of products and services that can be advertised; however, none of these additional details are claimed. *See*, *e.g.*, '734 Patent (FAC Ex. D), 1:43-51, 10:25-11:39; Ex. A (comparison of '734 specification v. '378 specification); *infra* §IV.B.3 (discussing '734 claim 1).

## II. BACKGROUND

The Asserted Patents—all related, with three of the four (the ’626, ’378, and ’342) sharing a specification—purport to automate generation of “deep-linked ad[s],” which the patents admit had previously existed while being “manually created.” 3:16-20. Deep-linked ads “fast-forward” Internet users “deep” within advertisers’ websites (as opposed to the advertisers’ home pages)—yielding (according to the Asserted Patents) better “conversion rates” because users find themselves much further along the purchase or “booking process.” 3:1-10. For example, if a user searches “flight rates from London to Amsterdam March 13,” the publisher of the site may provide a deep link to a partner airline’s “page where the user can purchase a flight ticket to travel by air from London to Amsterdam on March 13.” 17:64-18:35. The user, in other words, is “fast-forward[ed]” deep within the advertiser’s “conversion funnel,” improving return-on-investment for the advertiser as compared with other forms of click ads. 3:1-10.

The Asserted Patents do not allege that deep-linked ads themselves are patentable. Such ads are nothing more than the information-age equivalent of a travel agent who coordinates with an airline directly to book customers’ specific desired itineraries. Instead, the patents explain that creating deep-linked ads had traditionally been a “time and resource intensive activity” given the traditional practice of creating “deep-linked ad connections… ***manually***,” and in particular using “manual programming” to develop “programmatic integrations between variables and fields on the publisher web site and the advertiser web site,” which use different terminology. 3:17-27; FAC ¶13. Given this purported problem, the inventors sought to take the existing concept (i.e., deep-linked ads) and make it more scalable by creating “accurate mappings ***without any human intervention***.” 13:65-14:2. The Asserted Patents identify an alleged “need for an automated way to generate deep-linked ads” to promote “***wider adoption*** of these kinds of ads by ***increasing numbers*** of participating web sites,” thus creating “***market efficiencies***” and yielding “***greater economic gains*** for a ***larger cross-section*** of... sites.” 3:36-42.

To this end, the Asserted Patents disclose “automating the spidering or otherwise data gathering, archiving, inferring, linking and programmatic use of dynamic data and the programming containers” from websites and mobile applications. 3:48-55. They describe various

techniques for such data generation, including "[c]reat[ing] a list of all the verticals," "[g]enerat[ing] lists of web sites belonging in" such verticals, "[r]un[ning] asynchronous spiders," "[n]ormaliz[ing]" the relevant variables, "[c]reat[ing] mini-integrations or handshakes," "gathering the dynamic landing page URL… as opposed to a static home page," and "[r]un[ning] processes to continually validate, update and fine-tune the data gathering." 4:21-5:3.

However, none of the claims identified in the FAC—Claim 1 of each Asserted Patent—recite any specific such techniques. The identified claims instead track Figure 3, which recites only three high-level concepts: (1) "Create and Maintain Universal Map," (2) "Automatically Generate Deep-Linked Ads," and (3) "Present Deep-Linked Ads to E-Commerce Consumers in Real Time." In other words, beyond just automating the known generation of deep-linked ads, the identified claims reduce to the concept of a "universal variable map" linking programming variables from two different websites or mobile applications. This "map" ostensibly obviates the need for "programmatic integrations between variables and fields on the publisher web site and the advertiser web site, created by manual code." 3:16-20. Put differently, the map ***translates*** between different terminology to speed up the automation, as Table 1 exemplifies:

| Web Sites | xxx.com | yyy.net | zzz.org | . . . | Normalized Variables |
|---|---|---|---|---|---|
| Variable 1 | Orig | Depart_City | From | . . . | from |
| Variable 2 | Dest | Arrival_City | To | . . . | to |
| Variable 3 | . . . | . . . | . . . | . . . | . . . |
| . . . | . . . | . . . | . . . | . . . | . . . |

10:10-19. Metarail's FAC concedes the same: "while three different websites have different ways in which they identify programming dynamic input fields" (FAC ¶22), the variables are then "indexed to their normalized versions… allowing for the automatic and optimized generation of deep-linked ads." FAC ¶24. The Asserted Patents stress that such mapping itself enables scalability. 14:54-59. But they never define any technical improvement in database technology to implement the map. Indeed, Table 1 is merely "[a] non-limiting example." 10:9-10. The claims identified in the FAC likewise recite the map in purely functional terms by reference to "programming variables" or "field identifiers," which the patents use interchangeably. 3:51, 4:31-33, 9:30-37, 9:51-64, 13:37-41.

The recent *ex-parte* reexaminations confirm that the claims are directed to the abstract

concept of automating the creation of deep-linked ads. In finding the claims non-obvious, the examiner noted the specification's above-discussed admissions that deep-linked ads were known. Ex. F at 8 (discussing "Admitted Prior Art ('APA')").[2] The examiner also noted that the "universal variable map" was known in the art. *Id.* at 7. The examiner held, however, that while the APA in combination with the other prior art at issue disclosed ***manually*** creating deep-linked ads using a universal variable map, the prior art did not teach ***automatically*** creating those ads: "[t]hat is to say, the concept of ***manually*** creating deep-linked ads does not fill the voids related to the claimed deep-linked ad found missing in" the other prior art, "nor does it disclose how one of ordinarily [sic] in the art could ***automatically*** do so even if all the features of the claimed deep-linked ad were disclosed." *Id.* at 8-9. In sum, the examiner confirmed what the pre-*Alice* specification itself admits: the supposed novelty of the claims merely entails doing "automatically" a process that advertisers had already been performing "manually." *Id.*

## III. LEGAL STANDARDS

*Alice Corp. Pty. v. CLS Bank Int'l*, 573 U.S. 208 (2014) outlines a two-prong framework for determining patent-eligibility under § 101. First, a court must determine whether a claim is directed to an abstract idea. *Id.* at 217, 221. Second, in such a case, the court must determine whether the claim includes an "inventive concept," that is, some additional element or combination of elements "sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself." *Id.* at 217-18. If the claim lacks an inventive concept "sufficient to 'transform' the claimed abstract idea into a patent-eligible application," it is patent-ineligible and invalid under § 101. *Id.* at 221.

"Patent eligibility is appropriately decided on a motion to dismiss 'when there are no factual allegations that, taken as true, prevent resolving the eligibility question as a matter of law.'" *EcoFactor, Inc. v. Google LLC*, 757 F. Supp. 3d 978, 984 (N.D. Cal. 2024) (quoting *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1125 (Fed. Cir. 2018)). "Courts in this district" indeed "have regularly granted" such motions. *Id.* The Court "need not accept as true allegations that contradict matters properly subject to judicial notice or by exhibit,

[2] Unless otherwise noted, "Ex." denotes an exhibit to the Luster Declaration filed herewith.

such as the claims and the patent specification." *Secured Mail Solutions LLC v. Universal Wilde, Inc.*, 873 F.3d 905, 913 (Fed. Cir. 2017) (internal quotations omitted). Nor can patentees "[m]erely alleg[e] inventiveness without tying those allegations to the patent." *IBM Corp. v. Zillow Grp., Inc.*, No. 2022-1861, 2024 WL 89642, at *5 (Fed. Cir. Jan. 9, 2024).

## IV. ARGUMENT

### A. Claim 1 of the '626 Patent Is Ineligible Under § 101

Claim 1 of the '626 Patent—the only '626 claim asserted in Metarail's FAC—fails both *Alice* steps and therefore is patent-ineligible. Indeed, it tracks previously pending claims the PTO rejected under § 101 during prosecution of the earlier '378 Patent. *See* Ex. B. The PTO stressed that "the concept of selecting a deep-linked ad based on a universal variable map and placing the ad on a page would be directed towards a method of organizing human activities, which is an example identified by the courts as an abstract idea." FAC Ex. J at 202. The PTO later reaffirmed that Metarail's claimed "methodology" involved "the normal operation of the Internet," with the claimed "universal variable map" reflecting "well-known and conventional computer functions." *Id.* at 146-147, 153. Metarail never contested the PTO's findings, but instead amended the pending claims to secure the '378 Patent.[3] The PTO later allowed the '626 Patent on the theory that the as-amended "claims overcome problems with previously used techniques for online deep-linked ad connections." Ex. C at 19. But the paragraphs in the specification cited by the PTO (*id.* (citing what became 3:7-4:17)) merely discuss the benefits of "automating" the previous "manual" programming process—which the PTO had emphasized did ***not*** overcome the § 101 rejection during prosecution of the '378 Patent.

#### 1. *Alice* Step One: Claim 1 Is Directed to An Abstract Idea

The first *Alice* step considers the "focus" of the claims—*i.e.*, their "character as a whole." *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1353 (Fed. Cir. 2016). Particularly with software claims, such analysis "often turns on whether the claims focus on specific asserted improvements in computer capabilities or instead on a process or system that qualifies [as] an abstract idea for which computers are invoked merely as a tool." *IBM Corp. v. Zillow Grp., Inc.*,

[3] These additional elements do not save the '378 Patent. *See infra* §IV.B.1.

50 F.4th 1371, 1377 (Fed. Cir. 2022). Here, Claim 1 recites no such improvements.

**a. Claim 1 Focuses on Translation to Automate Ad Generation**

Claim 1 concerns the abstract idea of translating between different terms used by different websites. That translation yields what the claim calls a "universal variable map" but which in reality is a simple index (such as that illustrated in Table 1) used to ***automate*** the process of generating and serving deep-linked ads between those websites. In particular, Claim 1 concerns "***generating***, by a server computer, ***a deep-linked ad*** utilizing a universal variable map stored in a data store and accessible by the server," with the "map linking programming variables across multiple sites on the Internet and applications" such that a user device can be "***automatically***" sent from a first site to a second. The specification reiterates that this activity—generating deep-linked ads—was previously performed manually and that the inventors merely sought to expedite the generation of such ads by automating the process. The FAC confirms the same. But the Federal Circuit has consistently held that such automation is not patentable.

***i. Manually Created Deep-Linked Ads Were Already Known***

The '626 Patent admits that "deep-linked ad connections" were known in the art and traditionally had been "manually created by developing programmatic integrations between variables and fields on the publisher web site and the advertiser web site" using "manual programming" after "manually obtain[ing]" the relevant information (i.e., "field descriptors and variable names") from the publisher and advertiser. 3:16-25; FAC ¶13. The purported problem was simply that "manual programming" was "time and resource intensive"—making deep-linked ads less convenient than an automated solution. 3:26-42; FAC ¶13. The patent noted the purported "need for an automated way to generate deep-linked ads" to "spur rapid and much wider adoption" and reap "greater economic gains." 3:36-42. The claimed embodiments "automate a new generation of ads on the Internet and mobile devices that have not been possible before without extensive human intervention and programming." 19:26-29; FAC ¶17.

Metarail's FAC admits the same—the purported change to "infrastructure" (FAC ¶14) was nothing more than automating previously manual processes by which programmers had developed "programmatic ***integrations*** between ***variables*** and ***fields*** on the ***publisher web site***

and the ***advertiser web site***" (3:16-25). Metarail's own characterizations highlight how Claim 1 of the '626 Patent "is intended to improve the previously-used *manual* process for [creating deep-linked ads] by using generic computer and network components and processes to automate it." *Hewlett Packard Enter. Co. v. Inspur Grp. Co.*, No. 24-CV-02220-JST, 2025 WL 754265, at *13 (N.D. Cal. Mar. 10, 2025) (emphasis original). And Metarail's other allegations to the contrary (*e.g.*, FAC ¶¶10, 14 (asserting patent "transformed the infrastructure of Internet advertising"), 21 (describing patent as "novel")) are mere "conclusory statements" to be "disregard[ed]… when evaluating a complaint under Rule 12(b)(6)." *Simio, LLC v. FlexSim Software Prods., Inc.*, 983 F.3d 1353, 1365 (Fed. Cir. 2020) (affirming § 101 dismissal despite complaint's allegation that claimed feature "improves" computer "functioning and operations").

In sum, Claim 1 automates existing human practices, as the inventors themselves admitted in a specification dating back to the original application filed on November 30, 2011—years before the Supreme Court's *Alice* decision reshaped § 101 law. *See*, *e.g.*, *OIP Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1363 (Fed. Cir. 2015) (finding unpatentable a patent emphasizing automation as the purported "key distinguishing feature"); *see also* Ex. F at 8-9 (confirming that allegedly novel feature was automation of deep-link creation).

***ii. Automating Existing Human Processes Is Abstract***

As the Federal Circuit has repeatedly held after *Alice*, methods to automate existing human processes (here, generating deep-linked ads) are a "telltale sign of abstraction." *PersonalWeb Techs. LLC v. Google LLC*, 8 F.4th 1310, 1316-18 (Fed. Cir. 2021) (claims for data management tools "directed to a medley of [human] mental processes" are abstract); *see also*, *e.g.*, *Credit Acceptance Corp. v. Westlake Servs.*, 859 F.3d 1044, 1055 (Fed. Cir. 2017) (claims using computers to automate application process previously performed manually invalid: "[M]ere automation of manual processes using generic computer components does not constitute a patentable improvement in computer technology."); *Intell. Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1318 (Fed. Cir. 2016) ("[W]ith the exception of generic computer-implemented steps, there is nothing in the claims themselves that foreclose them from being performed by a human."); *OIP*, 788 F.3d at 1363 (claims to "automat[ing] or otherwise mak[ing] more efficient traditional price-optimization methods" were abstract).

Nowhere does the '626 Patent disclose—much less claim—any "specific improvement to the way computers operate." *Univ. of Fla. Rsch. Found., Inc. v. Gen. Elec. Co.*, 916 F.3d 1363, 1367 (Fed. Cir. 2019). The specification instead "emphasize[s] that the key distinguishing feature of the claims is the ability to automate" and thereby make "more efficient" existing human-performed methods. *OIP*, 788 F.3d at 1363. By the inventors' admission, "deep-linked ad connections" previously existed. 3:16-20; *see Univ. of Fla.*, 916 F.3d at 1367 (affirming § 101 dismissal when patent admitted that process for standardizing data formats had previously been performed "manually"). The ostensible problem being addressed was not technological, but economic: the "time and resource[s]" required for the "manual programming" establishing the connections. 3:26-29. "But relying on a computer to perform routine tasks more quickly" and cost effectively "is insufficient" for patentability. *OIP*, 788 F.3d at 1363 (affirming unpatentability despite specification's emphasis that prior art "cost more and [took] more time").

Claim 1 is indistinguishable from others the Federal Circuit has previously held invalid under § 101. *See*, *e.g.*, *SurgeTech, LLC v. Uber Techs. Inc.*, 700 F. Supp. 3d 179, 181 (D. Del. 2023), *aff'd*, 2025 WL 1621648 (Fed. Cir. June 9, 2025) (invalidating claims to "computer-implemented method of managing online bookings" with steps of "linking… each item in the transportation services inventory with one of a plurality of online distribution channels," "receiving" information from each channel, "processing" the information to rate each channel, "querying" the best rating across the channels, and in turn "adjusting" price information and "modifying, via the computerized network, the linkage" of items to the channels).

Like the specification here, the *SurgeTech* specifications confirmed that the challenged claims did not address a "technological problem, but one of human inefficiency that could be solved by automation." *SurgeTech*, 700 F. Supp. 3d at 185. For example, the *SurgeTech* specification described the purported invention as necessary because it was "practically impossible for [the retailers] to manage this inventory in multiple [c]hannels…." *Id*. The '626 Patent acknowledges the same: "This manual programming is a time and resource intensive activity that ***multiplies as the size of the network grows***…." 3:26-29. But the scale of information on the Internet "does not render the issue of organizing and analyzing said

information a technological problem." *SurgeTech*, 700 F. Supp. 3d at 186. Nor does "speed[ing] up human activity" save otherwise ineligible claims. *Recentive Analytics, Inc. v. Fox Corp.*, 134 F.4th 1205, 1214 (Fed. Cir. 2025) ("We have consistently held, in the context of computer-assisted methods, that such claims are not made patent eligible under § 101 simply because they speed up human activity"); *see also Sanderling Mgmt. Ltd. v. Snap Inc.*, 65 F.4th 698, 705 (Fed. Cir. 2023) (affirming § 101 dismissal despite patentee's emphasis on "scalability and speed").

Critically, nothing in Claim 1 "improve[s] computer technology." *Trinity Info Media, LLC v. Covalent, Inc.*, 72 F.4th 1355, 1363 (Fed. Cir. 2023) (affirming § 101 dismissal despite complaint's allegation that claimed invention marked "a significant advance over the art"). Instead, the specification frames the problem "in terms of how to improve existing" deep-linked ads and make them more scalable. *Id*. ("The specifications frame the inventor's problem in terms of how to improve existing polling systems by performing progressive polling, not how to improve computer technology."). But improving advertising efficiency does not suffice. *Trading Techs. Int'l, Inc. v. IBG LLC*, 921 F.3d 1378, 1383-84 (Fed. Cir. 2019) (claims ineligible because they focused on "improving the trader, not the functioning of the computer"); *Quad City Pat., LLC v. Zoosk, Inc.*, 498 F. Supp. 3d 1178, 1187-88 (N.D. Cal. 2020) ("While these methods may improve the economic practices at issue, they provide no benefit to the computer itself."). "[I]ncreased efficiency" indeed comes "in almost every case where a manual process is automated." *Semiconductor Design Techs., LLC v. Cadence Design Sys., Inc.*, 735 F. Supp. 3d 1162, 1165 (N.D. Cal. 2024) (granting motion to dismiss).

#### ***iii. The "Universal Variable Map" Concerns Indexing and Translation—Not a Technical Improvement***

Claim 1's "universal variable map" is not a technological improvement and does not alter the abstractness of the claim. The map just translates "programming variables across multiple sites on the Internet and applications." '626 Patent, Claim 1; FAC ¶¶14, 29. As Metarail admits, the map is "accessed to cross reference programming variables used by the search engine… and those used by the search site…." FAC ¶23. But such "cross-referenc[ing]" of information is "longstanding conduct that existed well before the advent of computers and the Internet." *Intell. Ventures I LLC v. Erie Indemnity Co.*, 850 F.3d 1315, 1327-28 (Fed. Cir. 2017) (invalidating

claims "not focused on ***how*** usage of the XML tags" improved "the technology of computer databases") (emphasis original); *see also Intell. Ventures I LLC v. Cap. One Fin. Corp.*, 850 F.3d 1332, 1340-41 (Fed. Cir. 2017) (invalidating claims focused on managing otherwise "incompatible" XML documents).

Here, as in *Erie*, the "universal variable map" is merely "the abstract idea of creating an index and using that index to search for and retrieve data." 850 F.3d at 1328; *see also Semiconductor Design*, 735 F. Supp. 3d at 1165-67 (holding that "automating assertion generation" by "translating one form of computer specification into another" via a "correspondence table" was abstract); *directPacket Rsch., Inc. v. Polycom Inc.*, No. 19-CV-03918, 2023 WL 6301066, at *6 (N.D. Cal. Sept. 26, 2023) ("[T]he translation of 'multimedia streams' using an intermediate protocol is readily analogized to the abstract idea of language translation."), *aff'd*, 2025 WL 1752247 (Fed. Cir. June 25, 2025). The Federal Circuit indeed has consistently held that "converting formats" is an abstract idea. *E.g.*, *Hawk Tech. Sys., LLC v. Castle Retail, LLC*, 60 F.4th 1349, 1357 (Fed. Cir. 2023) (quoting *Adaptive Streaming Inc. v. Netflix, Inc.*, 836 F. App'x 900, 903 (Fed. Cir. 2020)).

Tellingly, nothing in Claim 1 specifies any technical detail regarding ***how*** the universal variable map "make[s] the computer run more quickly, use less memory, or otherwise perform more efficiently." *Semiconductor Design*, 735 F. Supp. 3d at 1166; *see also Software Rts. Archive, LLC v. Facebook, Inc.*, 485 F. Supp. 3d 1096, 1105 (N.D. Cal. 2020) (holding that claim to method for "analyz[ing] relationships between items" was abstract despite yielding "better search results," as it did "not represent any direct improvement to computer technology"). That different websites may use different terminology (i.e., "programming variables" or "field identifiers") concerning the same concepts is no different from how newspapers and potential advertisers might use different terms for the same categories. Yet newspaper staffers nevertheless could (and did) ensure that ads from "car" sellers were targeted in the "Automotive" section whereas ads from "airlines" were placed in the "Travel" section—just like the '626 Patent admits deep-linking programmers created "programmatic integrations between variables and fields." 3:16-26. The claimed "universal variable map" does not improve computer

functioning, but rather merely facilitates the above-discussed automated handling of an issue endemic to advertising long before the Internet existed. When publishers and advertisers use different terminology, someone (e.g., a programmer or sales representative) or something (e.g., an index such as the claimed "universal variable map") must translate between the two. 3:7-25; *see also* 4:38-42. Such translation is a "fundamental economic practice long prevalent in our system of commerce"—not a patentable invention. *Alice*, 573 U.S. at 219; *see also People.ai, Inc. v. Clari Inc.*, No. 2022-1364, 2023 WL 2820794, at *16 (Fed. Cir. Apr. 7, 2023) (affirming dismissal of claims reflecting generic "matching policies"). It is immaterial how "difficult" it may have been to create deep-linked ads manually. *Cap. One*, 850 F.3d at 1339 (finding claims abstract even though they obviated need for "specialized programming skills").

Nor does Claim 1 require the universal variable map to use specific technology; it simply must aggregate and "organize" data (such as Table 1's tabular columns) from different websites. *Id*. (finding abstract claimed "dynamic document" for rendering XML documents compatible). *Cf. Enfish, LLC v. Microsoft Corp*., 822 F.3d 1327, 1337 (Fed. Cir. 2016) ("[T]he claims are not simply directed to ***any*** form of storing tabular data….") (emphasis original). "No special rules or details… are recited." *Secured Mail*, 873 F.3d at 910. And nothing in the claim improves how "systems store and access data"; instead, the map exploits a computer's "ordinary capacity" to store information—obviating the need to collect and link data manually. *BSG Tech LLC v. Buyseasons, Inc*., 899 F.3d 1281, 1288 (Fed. Cir. 2018) (distinguishing *Enfish*).

Consistent with Claim 1's lack of specificity, the specification notes that ***any*** "database" can constitute the universal variable map. 10:3-5 ("***[O]ne example*** of [the universal variable map] is implemented as variable database 530…."). The "focus of the claims, therefore, remains at a high level on" automatically generating deep-linked ads. *Erie*, 850 F.3d at 1328. Reciting the "universal variable map" as the chosen index "does not change that conclusion." *Id*.

#### b. The Remaining Claim Elements Concern Collecting and Analyzing Data—Not Any Technological Improvement

Aside from reciting the above-discussed map and the automated creation of deep-linked ads, Claim 1 merely recites at a high level the collection, analysis and manipulation of data—not any patentable improvement in computer technology. *See, e.g.*, *IBM*, 50 F.4th at 1378; *Elec.*

*Power Grp.*, 830 F.3d at 1353. In this regard, Claim 1 is analogous to the "computer-implemented method" the Federal Circuit addressed in *Recentive*, 134 F.4th at 1208 n.2. The *Recentive* claims concerned "a computer-implemented method of dynamically generating a network map," including "receiving" a schedule of events, "generating" a network map based on the schedule, "automatically updating" the network map in real-time, and "using the network map" to make determinations concerning events. *Id.* at 1208 nn.2-3. The Court analogized such claims to previous cases involving data collection and holding that "the application of existing technology to a novel database does not create patent eligibility." *Id*. at 1214.

Here likewise, Claim 1's method includes "generating" deep-linked ads, which per the specification includes steps of data gathering—"extracting" in the claim's parlance—and archiving. 3:48-55. But as with the claims at issue in *Recentive*, Claim 1 does not delineate any technical improvement in computer functioning—much less "describe how such an improvement was accomplished." *Recentive*, 134 F.4th at 1213. Instead, it merely uses the computer as a tool to "automat[e] the spidering or otherwise data gathering, archiving, inferring, linking and programmatic use of dynamic data and the programming containers or variables for this dynamic data," which the patent describes as the way to generate deep-linked ads automatically. 3:48-55. It is immaterial whether manually programming "thousands if not millions of programming variables" (FAC ¶24) was "possible… in real-time" (*id.*, ¶25). Nothing in Claim 1 ties the automation to any "improvement in the ***functioning*** of the system." *Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1333, 1337-40 (Fed. Cir. 2017) (emphasis original) (invalidating under § 101 claims to "improved scalable architecture"). At best, Claim 1 "uses… generic computer components to carry out the recited abstract idea." *Id*. Nor does it matter that Claim 1 recites "pre-populat[ing]" the second site with values from the first. (FAC ¶¶26-28). Such pre-population is an indisputably "conventional" concept that cannot circumvent *Alice*. FAC Ex. J at 147 (examiner's uncontested findings during prosecution). Metarail's FAC concedes that the pre-population in this context is facilitated by the "universal variable map" and the automation it facilitated. FAC ¶25 (citing FAC Ex. J at 268). Nothing in Claim 1 recites any technical advance enabling this practice of pre-populating data. The "New Search Site Webpage"

instead is generated using the same conventional computer architecture generating the "Old Search Site Webpage." FAC ¶¶27-28. Nor does Claim 1 recite "***how*** to" pre-populate, confirming it is "insignificant post-solution activity." *IBM*, 50 F.4th at 1379 (emphasis original).

While Metarail cites Google documentation as "tout[ing]" Metarail's supposed "technological advancement," none of the material concerns pre-populating values. FAC ¶31. The cited materials instead discuss deep-linked ads generically and note how they "drive… users directly into relevant app pages." *Id*. But as the specification admits and the FAC confirms, such deep-linked ads predated Metarail's purported invention. *See supra* §IV.A.1.a. The specification instead "frame[d] the inventor's problem in terms of how to improve existing [deep-linked ads by automating their creation], not how to improve computer technology." *Trinity*, 72 F.4th at 1363. Metarail's citations thus confirm Claim 1's ineligibility.

### 2. *Alice* Step Two: Claim 1 Recites No Inventive Concept

*Alice* step two concerns whether the challenged claim recites an "inventive concept" that "amounts to ***significantly*** more than a patent upon the [abstract idea] itself." *Alice*, 573 U.S. at 217-18. "[C]onventional, routine and well understood applications" do not suffice. *Ariosa Diagnostics, Inc. v. Sequenom, Inc*., 788 F.3d 1371, 1378 (Fed. Cir. 2015). Nor can an abstract idea itself provide an inventive concept. *PersonalWeb*, 8 F.4th at 1318. "To save a patent at step two," something ***beyond*** the abstract idea must be "evident in the claims" themselves—not merely in the specification. *RecogniCorp, LLC v. Nintendo Co*., 855 F.3d 1322, 1327 (Fed. Cir. 2017). Nor do PTAB rulings establish an inventive concept. *E.g*., *Papst Licensing GmbH & Co. KG v. Xilinx Inc*., 193 F. Supp. 3d 1069, 1094 & n.11 (N.D. Cal. 2016) (granting motion to dismiss as to claims for which PTAB had denied IPR), *aff'd*, 684 F. App'x 971 (Fed. Cir. 2017).

#### a. Increased Speed and Efficiency is Immaterial

Claim 1 lacks anything material beyond the above-discussed abstract concepts of automatically generating deep-linked ads using a prior-art "universal variable map" (which map reflects nothing more than the abstract idea of translating variables) and otherwise collecting and analyzing data. It is irrelevant whether the invention generates such ads faster than earlier approaches. *OIP*, 788 F.3d at 1363 ("[R]elying on a computer to perform routine tasks more

quickly or more accurately is insufficient to render a claim patent eligible."); *Etison v. Highlevel, Inc.*, No. 2025-1711, 2026 WL 1906579, at *1, *8 (Fed. Cir. July 2, 2026) (claims to digital sales "funnels" directing users to webpages were ineligible despite alleged speed improvement).

Claim 1 instead closely tracks the challenged claims in *Recentive*, in which reciting "conventional computing devices" was insufficient to transform abstract ideas into patent-eligible subject matter. 134 F.4th at 1211. Just as Recentive did not invent machine learning, *id.* at 1212-13, the '626 Patent admits Metarail did not invent deep-linked ads, but instead merely sought to automate them to reap "new market efficiencies"—yielding "greater economic gains for a larger cross-section of publisher and advertiser sites," 3:36-42. But such increased "speed and efficiency" does not suffice under *Alice* step two. *Recentive*, 134 F.4th at 1214 ("Whether the issue is raised at step one or step two, the increased speed and efficiency resulting from use of computers (with no improved computer techniques) do not themselves create eligibility."). Indeed, Claim 1 does not recite any "unconventional hardware and software structure" improving upon the prior art. *IBM*, 50 F.4th at 1379; *see also Semiconductor Design*, 735 F. Supp. 3d at 1168 ("The claims also fail to disclose any 'unconventional rules' or unconventional ordering that improve computer functionality."). Without a "concrete application of the abstract idea of [translation], the claims [are] not transformed into patent-eligible subject matter at *Alice* step two." *AI Visualize, Inc. v. Nuance Commc'ns, Inc.*, 97 F.4th 1371, 1379-80 (Fed. Cir. 2024).

**b. Claim 1 Differs Fundamentally From Those in *DDR***

Nor can Metarail evade § 101 by purported analogy to *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1257 (Fed. Cir. 2014), which concerned fundamentally different claims addressing "a problem specifically arising in the realm of computer networks" (the threat of website visitors being lured away by "'clicking' on an advertisement and activating a hyperlink") and solving it with a technological solution that ***altered*** "the routine, conventional functioning of Internet hyperlink protocol." 773 F.3d at 1257.

Here, unlike *DDR*, where the patent's "claims... specif[ied] how interactions with the Internet are manipulated to yield a desired result" that "overrides the routine and conventional sequence of events ordinarily triggered by the click of a hyperlink," Claim 1 of the '626 Patent

recites conventional steps for navigating an electronic database and conventional technology for implementing these steps. *Google LLC v. Sonos, Inc.*, 498 F. Supp. 3d 1138, 1154-55 (N.D. Cal. 2020). The specification admits as much—it merely "identifies problems with the prior ***manual*** method for" creating deep-linked ads. *Hewlett Packard*, 2025 WL 754265, at *15 (emphasis original). Automated deep-linked ads address those challenges by using "computer components" to implement "routine steps using generic elements" such as "databases," which "the patent does not invent." *Voip-Pal.Com, Inc. v. Apple Inc.*, 411 F. Supp. 3d 926, 972 (N.D. Cal. 2019) (distinguishing *DDR*), *aff'd*, 828 F. App'x 717 (Fed. Cir. 2020). Nor can Metarail circumvent this problem by attaching "technical sounding" names such as universal variable map to "generic data types" such as the translation table illustrated in Table 1. *Cap. One*, 850 F.3d at 1341.

The inventors merely automated the deep-linked ad creation process to increase efficiency. 3:16-47. And they stressed that any conventional components could be used to do so. *E.g.*, 21:18-21 ("***any medium***…"); 21:44-46 ("***any, hardware system, mechanism or component*** that processes data, signals or other information"). These conventional components are "simply doing something ***on*** a web page" (placing deep-linked ads) rather than "doing something ***to*** a web page" (e.g., altering standard hyperlink protocols). *Affinity Labs of Texas, LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1262 (Fed. Cir. 2016) (distinguishing *DDR*) (emphasis original). The ostensible problem the '626 Patent solved was not how to make computers perform differently, but instead how to navigate between publishers and advertisers who used different terms (e.g., "automotive" versus "car") to describe the same concepts. But "maintaining data from multiple sources and organizing it" is a "problem that is ***not*** unique to technology." *SurgeTech*, 700 F. Supp. 3d at 185 (distinguishing *DDR*).

Nor does Claim 1 otherwise "purport to solve a problem unique to the internet or computer functionality." *Enovsys LLC v. Uber Techs., Inc.*, No. 23-CV-04549-EJD, 2024 WL 3033995, at *9 (N.D. Cal. June 17, 2024). It is immaterial that the '626 Patent discusses terminological differences in the "Internet-centric" ***context*** of deep-linked ads. *DDR*, 773 F.3d at 1258 ("[N]ot all claims purporting to address Internet-centric challenges are eligible for patent."); *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 716 (Fed. Cir. 2014) (affirming motion

to dismiss complaint asserting claims to Internet-based advertising: "[U]se of the Internet does not transform an otherwise abstract idea into patent-eligible subject matter."); *Receivership Est. of AudienceScience Inc. v. Google LLC*, No. 2024-1825, 2026 WL 2880090, at *5 (Fed. Cir. Sept. 25, 2026) (distinguishing *DDR* and finding claims directed to "selecting the most effective ad" unpatentable because such selection was a "non-internet centric problem" since the ads were "analogous to advertisements conventionally run in print or on television"). Put differently, as in *SurgeTech*, "just because the Internet permits" deep-linked ads as a marketing strategy does not mean that navigating terminology differences on the Internet is a "technological problem." *SurgeTech*, 700 F. Supp. 3d at 186 (collecting cases). Nothing in Claim 1 alters the conventional functioning of computers or networks. Instead, as the record confirms, Metarail's methodology works "through the normal operation of the Internet." FAC Ex. J at 147.

**B. The Additional Elements of the Other Identified Claims Do Not Render Them Eligible Under § 101**

The other claims addressed in the FAC are ineligible for the same reason: they rely on conventional computer technology to automate known steps. All four patents are linked through terminal disclaimers following double patenting rejections (Ex. D at 7, 18, 20-21, 23; Ex. C at 3-7, 13, 14-16, 18; Ex. E at 4-7, 18, 20-22, 26)—a "strong clue" that the patents lack "patentable distinction[s]" amongst them. *SimpleAir, Inc. v. Google LLC*, 884 F.3d 1160, 1168 (Fed. Cir. 2018). To the extent the other claims include additional elements beyond those discussed above, they merely recite "result-focused, functional" steps for collecting and analyzing information. *Elec. Power*, 830 F.3d at 1356. None of the claims recite a "technical means for performing the functions that are arguably an advance over conventional computer and network technology." *Id.* at 1351. They instead merely define "a desirable information-based result." *Id.*

**1. Claim 1 of the '378 Patent Is Ineligible Under § 101**

To the extent Claim 1 of the '378 Patent recites elements beyond those in Claim 1 of the '626 Patent, they are generic, functionally defined steps for generating the universal variable map, which the claim also describes as a "normalized variable data database." In particular, the claim recites: (1) obtaining, utilizing a set of obtaining rules, a plurality of explicit or implicit computer-readable field identifiers from a plurality of sites or applications on the Internet; and

(2) applying via programming code a set of enhancing rules to enhance results of the obtaining of the plurality of computer-readable field identifiers. These steps track Figure 4 of the specification, which illustrates searching for and normalizing "programming variables" (also known as computer-readable field identifiers). But these additional elements do not make the claim any less abstract. Instead, they merely automate pre-existing processes using pre-existing tools. When describing Figure 4, the specification indeed describes how operators may specify particular "categories of sites to be searched on the Internet" by entering the data on a "list," which may be in the form of an "excel file list, or ***any other form of entry*** suitable for input to one or more modules for data gathering." 8:36-44.

While Claim 1 of the '378 Patent also recites that the deep-links link fields are on different pages "without necessitating any pre-existing relationship between the pages," this merely recites the result of performing abstract steps. The '378 Patent's specification never even mentions the lack of a pre-existing relationship—much less discloses unconventional computer or networking technology for achieving such a result.

**a. *Alice* Step One: Claim 1 is Directed to an Abstract Idea Despite the Additional Elements**

The additional elements of Claim 1 of the '378 Patent do not change its "character as a whole" as compared to the '626 Patent for purposes of *Alice* step one. *Elec. Power*, 830 F.3d at 1353. The added language does not "focus on specific asserted improvements in computer capabilities," but instead invokes computers "merely as a tool" for gathering and organizing information humans had previously gathered and organized manually. *IBM*, 50 F.4th at 1377. Nor does it matter that these amendments led the patent examiner to withdraw a § 101 rejection following *Alice* concerning earlier versions of the claim. S*ee Sanderling*, 65 F.4th at 705 (affirming dismissal of complaint and rejecting patentee's reliance on file histories: "[C]ourts are not required to defer to Patent Office determinations as to eligibility."). Moreover, all of Metarail's patents (including the '378) were issued before multiple important Federal Circuit decisions discussed herein such as *IBM*, *Recentive*, and *Hawk Tech*.

***i. "obtaining" "field identifiers" using "rules"***

For one, it is immaterial that Claim 1 recites "applying via programming code a set of enhancing rules to enhance results of the obtaining of the plurality of computer-readable field identifiers." Claims do not become eligible by invoking a "rule" with a recited result. *See Sanderling*, 65 F.4th at 703 ("'distribution rule' that merely receives, matches, and then distributes" is abstract). The rule must instead do more than use "computers as a tool." *Id*.

Nothing in the claim or the specification explains how generic "rules" improve the "way computers operate." *FairWarning IP, LLC v. Iatric Sys., Inc*., 839 F.3d 1089, 1094-95 (Fed. Cir. 2016) (holding that "claimed rules" were abstract because they "merely implement an old practice in a new environment" instead of being "specific, limited mathematical rules"). On the contrary, the specification offers examples of simple heuristics such as looking for "[p]artial word matches" (15:35)—that is, basic "business rules" like those previously applied by humans. *Symantec*, 838 F.3d at 1316-17 (finding abstract claims to "a rule engine" for applying rules such as those applied in a "corporate mailroom"); *see also RingCentral, Inc. v. Dialpad, Inc.*, 372 F. Supp. 3d 988, 995-97 (N.D. Cal. 2019) (finding abstract claim to "distribution rules" akin to those that could be used by human beings in a "mailroom" to route mail). Likewise, in *Cave Consulting Group, Inc. v. Truven Health Analytics Inc.*, the claim at issue recited "assigning complete (non-partial) episodes of care to physicians utilizing an assignment rule that allows assignment of an episode of care to more than one physician." No. 15-cv-02177-SI, 2017 WL 6405621, at *3 (N.D. Cal. Dec. 15, 2017), *aff'd*, 756 F. App'x 997 (Fed. Cir. 2019). The patentee argued that the claim was not abstract because the patent "disclos[ed] very specific rules for improving the technological process of measuring physician efficiency." *Id.* at *6. The court rejected this argument and found the claims invalid because the claim language itself phrased the rules "in extremely broad, generic terms," such that all claims were "directed at the abstract idea of collecting, manipulating, and analyzing medical claims data." *Id.* at *7.

Here, as noted *supra* §IV.A.1.a, the specification admits that it was known to manually "map[] and integrate[]" fields among different websites. Furthermore, nowhere does Claim 1 of the '378 Patent recite technical details of how the "obtaining" and "enhancing" "rules" are implemented, nor does the claim recite any details about these rules beyond the fact that the rules

are for "obtaining" and "enhancing." Thus, just as in *FairWarning*, the "claimed rules" "merely implement an old practice in a new environment" and are therefore abstract. 839 F.3d at 1094-95. Furthermore, just as in *Cave Consulting*, the rules are "phrased in extremely broad, generic terms" and address the "abstract idea of collecting" information. 2017 WL 6405621, at *7.

***ii. "normalized variable data database"***

Claim 1's reference to a "normalized variable data database" is likewise irrelevant. The claim does not impose any requirements on such database other than (1) storing "a set of normalized variables" and (2) "representing a universal variable map." But the map is itself an abstract idea. *See supra* §IV.A.1.a. Furthermore, neither the specification nor the claim recites any particular database technology for implementing the database, much less any improvement to conventional database technology. The specification instead describes the database in generic terms (*e.g.*, 8:50-53, 9:30-36, 10:4-6). That generic description further confirms the database is "conventional" (*Beteiro, LLC v. DraftKings Inc.*, 104 F.4th 1350, 1358 (Fed. Cir. 2024) (citing characterization in specification)), consistent with the examiner's finding that the universal variable map was known in the art (*see* Ex. F at 7).

Because the "normalized variable data database" is simply a conventional database that performs its conventional function of storing data, its recitation in the "mapping" limitation is immaterial. *See*, *e.g.*, *Recentive*, 134 F.4th at 1212 (patent claims that "rely on the use of generic machine learning technology in carrying out the claimed methods for generating event schedules and network maps" found abstract at Step One where "[t]he machine learning technology described in the patents is conventional, as the patents' specifications demonstrate"). So too is the universal variable map's limitation to "searchable classes and attributes of products or services on the Internet." '378 Patent, Claim 1. The recitation of "searchable classes…" simply describes a type of information in the map. "Information as such is an intangible, hence abstract, and collecting information, including when limited to particular content (which does not change its character as information), is within the realm of abstract ideas." *SAP America, Inc. v. INVESTPIC, LLC*, 898 F.3d. 1161, 1167 (Fed. Cir. 2018) (cleaned up).

***iii. "pre-existing relationship"***

Nor does Claim 1 avoid abstractness by referring to linking field identifiers on different pages "without necessitating any pre-existing relationship between the pages." As noted *supra* §II, the specification admits that creating links without preexisting relationships was a previously-known manual process. 3:17-27. Simply automating this process with a computer is abstract. *See*, *e.g.*, *Credit Acceptance*, 859 F.3d at 1055. Additionally, simply stating a limiting condition on a step of the method—no pre-existing relationship—is also abstract. *See*, *e.g.*, *Epic IP LLC v. Backblaze, Inc.*, 351 F. Supp. 3d 733, 741 (D. Del. 2018) (limitation "facilitating the dynamic formation of a chat session, unaffiliated with any pre-established chat room" is just a "barebone[] description[] of a result" and is abstract). Moreover, as discussed *supra* §IV.A.1, the idea of "linking" is an abstract concept. *See*, *e.g.*, *SurgeTech,* 700 F. Supp. 3d at 181 (invalidating claims to "computer-implemented method of managing online bookings" with steps of "linking… each item in the transportation services inventory with one of a plurality of online distribution channels"). That the linking is done without necessitating a pre-existing relationship is no less abstract, since a human is capable of determining links between fields without a pre-existing relationship (e.g., determining that "date" fields on two unrelated websites are fields for the same data), and the claim recites no limitation on how to produce that result other than the above-discussed abstract ideas of obtaining identifiers and storing them in the map. *See*, *e.g.*, *Interval Licensing LLC v. AOL, Inc.*, 896 F.3d 1335, 1345 (Fed. Cir. 2018) (holding that claim is directed to an abstract concept because the claim "simply demands the production of a desired result... without any limitation on how to produce that result").

**b. *Alice* Step Two: Claim 1 Recites No Inventive Concept**

Nor do the additional elements of Claim 1 of the '378 Patent rescue the claim under *Alice* Step Two. As explained above, Claim 1 merely recites "conventional, routine and well understood applications" of computer technology, which do not constitute an inventive concept. *Ariosa*, 788 F.3d at 1378; *see also Credit Acceptance*, 859 F.3d at 1056 ("The use and arrangement of conventional and generic computer components recited in the claims—such as a database, user terminal, and server—do not transform the claim, as a whole, into 'significantly more' than a claim to the abstract idea itself.") (quoting *Alice*, 573 U.S. at 225-26); *RingCentral*,

372 F. Supp. 3d at 998 (finding no inventive concept where "[t]he elements of the claim, as well as the specification, refer only to conventional computer equipment").

The claim also recites automating the creation of deep-links, but that itself is an abstract concept, and an abstract idea itself cannot provide an inventive concept. *PersonalWeb*, 8 F.4th at 1318. The recitation of "obtaining rules" and "enhancing rules," and the description of the universal variable map as being "of searchable classes and attributes of products or services on the Internet," also does not supply an inventive concept. *See*, *e.g.*, *Cave Consulting*, 2017 WL 6405621, at *10 (rejecting argument that "the use of rules… and the limitation of calculating scores based upon 'predefined sets' of medical conditions is inventive" where "the use of these assignment rules and the limitation of using predefined sets is simply a way of organizing data and then performing an algorithm. 'Without additional limitations, a process that employs mathematical algorithms to manipulate existing information to generate additional information is not patent eligible.'") (quoting *Digitech Image Techs., LLC v. Elecs. for Imaging, Inc.*, 758 F.3d 1344, 1351 (Fed. Cir. 2014)). The requirement of a lack of "pre-existing relationship" between pages adds no inventive concept because this language is merely a functional limitation expressing a desired ***result*** (linking without a preexisting relationship) in a certain environment (Internet links) without reciting any technical innovation to produce that result. *See*, *e.g.*, *Symantec*, 838 F.3d at 1316 ("[W]hen a claim directed to an abstract idea contains no restriction on how the result is accomplished and the mechanism is not described, although this is stated to be the essential innovation, then the claim is not patent-eligible.") (cleaned up); *Epic*, 351 F. Supp. 3d at 749 ("the functional limitation of 'facilitating dynamic formation of a chat session unaffiliated with any pre-established chat room' for two users to chat with each other does not constitute an 'inventive concept'" because "[i]t is well established that patent-ineligible subject matter does not become patent-eligible merely by being applied in a particular technological environment"). Indeed, the specification of the '378 Patent does not recite the term "pre-existing relationship" at all, reinforcing the lack of any technical novelty for achieving this result.

Contrary to the examiner's conclusion during prosecution, Claim 1 is not analogous to those at issue in *DDR* and did not resolve "a problem specific to the realm of Internet." FAC Ex.

J at 183-84; *see also Fitbit Inc. v. AliphCom*, No. 16-CV-00118-BLF, 2017 WL 819235, at *15-18 (N.D. Cal. Mar. 2, 2017) (finding claims ineligible despite examiner's statements in notice of allowance). Rather, as discussed *supra* §IV.A.1.a, the problems that Claim 1 allegedly solves—gathering data and mapping different fields to each other using a common label—are pencil-and-paper tasks that the claims merely purport to automate using a computer.

**2. Claim 1 of the '342 Patent Is Ineligible Under § 101**

Claim 1 of the '342 Patent is nearly identical to Claim 1 of the '378 Patent and is ineligible under § 101 for the same reasons. The only substantive differences between the claims are that Claim 1 of the '342 Patent (1) recites a "spidering module" for obtaining the computer-readable field identifiers (as opposed to "utilizing a set of obtaining rules" as in Claim 1 of the '378 Patent) and (2) also recites that the sites or applications being deep-linked be either "in same vertical or different verticals for which the spidering module is configured to search on the Internet." Neither the "spidering module" nor the recitation of "verticals" differentiates Claim 1 of the '342 Patent from Claim 1 of the '378 Patent for § 101 purposes.

Obtaining the identifiers using a "spidering module" does not make the recited "obtaining" any less abstract. The patent admits that "spidering" was simply one way of gathering data from websites. *See*, *e.g.*, 3:49 (referring to "spidering or otherwise data gathering"), 4:26-27, 4:51-52, 8:44, 9:5-6, 9:23-25 (referring to "spidering module or data gathering module 510"). Merely collecting data is abstract for the reasons discussed *supra* §IV.A.1.a. Moreover, reciting a "spidering module" identifies a desired outcome—collecting data—without explaining how to achieve that outcome; such vagueness shows abstractness. *See*, *e.g.*, *Interval Licensing*, 896 F.3d at 1345 (holding that claim was directed to an abstract concept rather than a technical improvement because it "simply demands the production of a desired result... without any limitation on how to produce that result").

Nor does the patent recite any novel hardware for implementing the spidering module to add an inventive concept under *Alice* Step Two. *See*, *e.g.*, *PUREPREDICTIVE, Inc. v. H20.AI, Inc.*, No. 17-CV-03049-WHO, 2017 WL 3721480, at *5-7 (N.D. Cal. Aug. 29, 2017), *aff'd*, 741 F. App'x 802 (Fed. Cir. 2018) (granting motion to dismiss where the "claims do not describe

specific system architecture, and references to generic 'modules' do not provide any further specificity" and therefore the patent "still cannot show that its claims improve the functioning of a computer-related technology rather than use computers as a tool").

As for the recitation that the sites linked are in the "same vertical ***or*** different verticals," listing these options in the alternative indicates that the claim element does not further limit the claim. But even if one assumed that the relevant language imposed some further restriction, it would still be immaterial because it simply limits the claim to collecting certain kinds of information. *See*, *e.g.*, *FairWarning*, 839 F.3d at 1093 (claims found abstract despite method reciting collection of a specific type of information); *INVESTPIC*, 898 F.3d at 1167 ("Information as such is an intangible, hence abstract, and collecting information, including when limited to particular content… is within the realm of abstract ideas.") (cleaned up). Nor could this ostensible limitation be inventive for purposes of *Alice* Step Two, as the claim does not recite any mechanism "for how a computer accomplishes it." *Cap. One*, 850 F.3d at 1341-42 (no inventive concept where claim "provide[d] only a result-oriented solution").

### 3. Claim 1 of the '734 Patent Is Ineligible Under § 101

Claim 1 of the '734 Patent is likewise very similar to Claim 1 of the '378 Patent. To the extent it recites additional concepts, they relate to (1) "accessing" the universal variable data database using a "computer having a processor and a non-transitory computer-readable medium" and (2) determining field identifiers based on "dynamic data collected through the user interface while the user is interacting with the user interface of the networked data source." This additional language does not save Claim 1 of the '734 Patent.

The requirement that the "accessing" be performed by a "computer" in response to interaction with a "user interface" does not make the limitation any less abstract than the limitations in the other claims reciting a universal variable map. Performing actions in response to interaction with a user interface is a generic use of interfaces, and accessing a database with a computer is a conventional use of a database. Furthermore, the claim does not recite any technical improvement in how user interfaces are used or how a database is accessed. A limitation that "simply recite[s] [a] conventional action in a generic way" and "do[es] not purport

to improve any underlying technology" is abstract. *Universal Secure Registry LLC v. Apple Inc.*, 10 F.4th 1342, 1349 (Fed. Cir. 2021) (affirming finding of abstractness of claim that recited "'accessing' the customer's account information"); *see also TS Patents LLC v. Yahoo! Inc.*, 279 F. Supp. 3d 968, 972, 986 (N.D. Cal. 2017) (finding patent related to allowing "an end-user to view and operate computing resources through [a] logically organized and graphically represented multi-layered item list" was an abstract idea).

Likewise, the "determining" step recites the same concept as the "obtaining" step in the '378 Patent, which is abstract for the reasons already explained *supra* §IV.B.1.a.i. That the determining happens under specific conditions—i.e., through the interface with which the user interacts—does not make it any less abstract. "An abstract idea does not become nonabstract by limiting the invention to a particular field of use or technological environment, such as the Internet." *Intell. Ventures I LLC v. Cap. One Bank (USA)*, 792 F.3d 1363, 1366 (Fed. Cir. 2015)

Nor does this additional verbiage add any inventive concept. The additional limitations simply recite performing abstract steps (e.g., accessing a database) using generic computer components such as a "computer" or a "user interface." There is nothing inventive about such generic uses of generic components. *See*, *e.g.*, *In re TLI Communications LLC Patent Litigation*, 823 F.3d 607, 613 (Fed. Cir. 2016) ("It is well-settled that mere recitation of concrete, tangible components is insufficient to confer patent eligibility to an otherwise abstract idea" where those components simply perform their "well-understood, routine, conventional" functions).

### C. The FAC Fails to State Plausible Allegations as to the Remaining Claims

While the FAC asserts that Google infringes "at least claim 1 of" each Asserted Patent (FAC ¶¶34, 41, 48, 55), it only includes "factual allegations" concerning "claim 1 of each [asserted] patent." *Netflix, Inc. v. Broadcom Inc.*, No. 24-CV-09324-PCP, 2025 WL 2294915, at *5 (N.D. Cal. Aug. 8, 2025). Even if the Court construed the FAC as "alleging infringement of the other claims," such allegations would be "entirely conclusory" and fail to state a claim under the *Iqbal*/*Twombly* standard. *Id*. Thus, the Court need not separately address the other claims.

## V. CONCLUSION

For the reasons stated above, Google requests that the Court dismiss the FAC.

Dated: October 15, 2026

Respectfully submitted,

*/s/ Gregory F. Corbett*

Gregory F. Corbett (admitted *pro hac vice*)
gcorbett@wolfgreenfield.com
Charles T. Steenburg (admitted *pro hac vice*)
csteenburg@wolfgreenfield.com
Anant K. Saraswat (admitted *pro hac vice*)
asaraswat@wolfgreenfield.com
Meaghan P. Luster (admitted *pro hac vice*)
mluster@wolfgreenfield.com
WOLF, GREENFIELD & SACKS, P.C.
600 Atlantic Avenue
Boston, MA 02210
Telephone: 617.646.8000

Elizabeth A. DiMarco (admitted *pro hac vice*)
edimarco@wolfgreenfield.com
WOLF, GREENFIELD & SACKS, P.C.
601 Massachusetts Avenue, NW
Washington, DC 20001
Telephone: 202.571.5001

Asim M. Bhansali (SBN 194925)
abhansali@kblfirm.com
KWUN BHANSALI LAZARUS LLP
555 Montgomery Street, Suite 750
San Francisco, CA 94111
Telephone: 415.630.2350

*Counsel for Defendant*
*Google LLC*

**CERTIFICATE OF SERVICE**

The undersigned certifies that all counsel of record who have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system on October 15, 2026.

/s/ *Gregory F. Corbett*
Gregory F. Corbett